[Crim. No. 1011. Fourth Dist. Dec. 13, 1954.]

THE PEOPLE, Respondent, v. WILLIAM RICHARD COOPER, Appellant.

Charles F. Sturdevant, Jr., for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

GRIFFIN, J.—A trial without a jury resulted in the conviction of defendant of the crime of burglary, second degree. As a condition of a five-year probation order defend-

ant was required to serve 30 days in jail, pay a fine of $600, and make restitution for actual damage done to the premises which defendant was found to have entered.

The sole question involved is the sufficiency of the evidence to support the judgment, and this bears mainly on the question of the identification of the accused. It is conceded that the evidence shows a burglary of the Dold Auto and Equipment Company building located near Dold's Used Car Lot in El Centro. There were two doors entering from this lot into the main building. Another door led to the showroom and another to the shop. Dold inspected and left the premises locked on Sunday, January 31, 1954, about 2 p. m. He returned about 4 p. m. and on entering the showroom he observed the window broken at the cashier's office, and a number of tools, consisting of small punches, crowbars, and a sledge hammer, were lying on the floor by the safe. Marks were on the vault door. He then proceeded to the shop and the south door was found to be unlocked and partially open, and the east door had a screwdriver placed through the inside clasp. The doors were locked with padlocks when he left at 2 o'clock. The lock on a door on the north side had been pried loose and a lock had been broken on a tool box. A trap door leading from the roof to the parts department had been pried open and entrance was gained by means of a ladder.

It appears that about 3 o'clock that day Denson, the parts man, and one Hembree drove to the shop in their own cars, unlocked the front door and heard a noise as though someone was running into the shop department. They proceeded to that place and saw a man near the south door which led to the used car lot. He was standing there with his head down and he then went out the door. He was wearing baggy slacks, a reddish-colored shirt, and no hat. Hembree identified this man as the same one who was standing at the edge of the lot when they arrived at the door. Denson called to him on two occasions and on the last one defendant came back to them. He was asked what was going on and defendant said a man just ran by, grabbed his (defendant's) hat, and "went that-a-way." He pointed toward the front of the premises. Denson saw no one in that direction but all three of them ran to the front of the building and they still observed no one there. About that time a blue Chevrolet car pulled out from the curb across the highway and defendant said that the persons in that car were the ones who ran by him.

A discussion ensued as to the probability of apprehending them and someone asked about a fast car and defendant volunteered to use his car which was parked near by and he drove away with Hembree to follow them. Denson returned to the building and called the officers. Defendant and Hembree soon returned and defendant left with the sheriff to further pursue the blue Chevrolet car. Such a car was stopped and two men were in it. Defendant failed to identify them. Neither of these two men wore a hat and none was found in their car.

Denson would not absolutely identify the defendant as the person he first saw in the shop when he entered it but did describe the clothing he wore with some accuracy. Hembree testified he observed defendant in the south door as he left the shop and the clothing he was wearing, and that he was sure it was the defendant whom he saw running out of the shop; that he saw no other person around there and that he knew it was the defendant who was standing in the used car lot when he arrived at the door of the shop.

As corroboration of the fact that it was the defendant who was in the shop on the occasion in question, examination was made of the shop by an officer and it was found that there were footprints in the grease on the floor in several places, some by the tools, others in the shop, and particularly where the person departed through the side door. An examination was made of defendant's car and there was quite a bit of greasy dirt on the floor boards on the driver's side, and on the clutch, brake and gas pedal. Samples were taken of it. There appeared to be grease on the bottom of defendant's shoes. Some of the shoe prints in and about the shop appeared almost identical with the measurement of defendant's shoes. A laboratory technician received eight samples of dirt and oil taken at the premises and on the floor boards and pedals of defendant's car. A "spectrum" test, "special lines cast by the elements on igniting them" was made of these samples. They "checked very closely." Defendant accounted for the oil on his shoes as being from another plant where he worked as a mechanic. Samples were taken of the oil on the floor at the place where defendant worked and there was no comparison by the spectrum test. No fingerprints were found on or about the safe or tools but only smudges which could have indicated that gloves were worn by the culprit. A pair of cotton gloves were found with some grease marks on them in the rear of the premises cached

away under a loading dock, and evidence was introduced that a grocer sold a pair of cotton gloves very similar to the ones found, about 1:30 that afternoon to a man answering somewhat defendant's description. Similar footprints to those of defendant's shoes were found leading to the place where the gloves were found, and a stray blue-colored thread taken from inside defendant's shirt was compared to a thread taken from the gloves and they were found to be identical.

Upon questioning by the officers defendant made various statements. He claimed he was looking at a car in the used car lot and suddenly a man ran past him and grabbed his hat. He stated that he did not chase him because the man was drunk; that he did not know whether he was white or colored but he knew he wore Levi's. When questioned about going around in front of the place of business with Denson and observing the two men drive away in the blue Chevrolet, he changed his story and said that two men had run by him and one grabbed his hat; that he felt badly about being questioned by the officers, and later, after some further questioning, he, according to the officers, remarked: "All right, so I did run out of there, so I did run and jump across the chain, so what? Go down there and find my fingerprints. You just go down there and find them." The officer then testified that the next morning defendant said the reason for not telling him about his previous arrests for burglary was because he was afraid they would hold it against him; and that he had not actually seen any man run by him or across the street on the occasion indicated.

Defendant did not take the witness stand but produced a witness who testified that she saw defendant at a nearby restaurant that afternoon about 3 p. m. and he was wearing a "Texas" hat at that time. In being questioned by the officers defendant stated he was wearing a Stetson hat then and he had obtained it at an auction that morning.

A recapitulation of the facts related and the inferences that might reasonably be drawn therefrom is unnecessary since they fully support the judgment. (*People* v. *Colletta,* 100 Cal.App.2d 1 [222 P.2d 922].)

Judgment and order denying new trial affirmed.

Barnard, P. J., and Mussell, J., concurred.